UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JAMES S. SLUKA,               )
                              )
            Plaintiff,        )
                              )
      vs.                     )          No. 4:05-CV-1976 (CEJ)
                              )
SOCIAL SECURITY ADMINISTRATION, )
Jo Anne Barnhart, Commissioner )
                              )
            Defendant.        )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse
ruling by the Social Security Administration.

## I. Procedural History

On September 6, 2003, plaintiff James S. Sluka filed an
application for a period of disability and disability insurance
benefits under Title II of the Social Security Act, 42 U.S.C. §§
401 et seq., §§ 1381 et seq., and an application for supplemental
security income disability benefits under Title XVI of the Act, 42
U.S.C. §§ 1391 et seq.[1] Plaintiff initially claimed disability due
to Hepatitis C, which has caused him pain and fatigue. (Tr. 104).
Plaintiff alleges that his disability began on March 1, 2002. (Tr.
101). The applications were initially denied by defendant. (Tr.
46-50). Plaintiff requested a hearing, which was held before an
Administrative Law Judge ("ALJ") on March 23, 2005. Plaintiff
testified at the hearing, but he was not represented by counsel.
(Tr. 184-196). On May 17, 2005, the ALJ found that plaintiff was

---

[1]Plaintiff's protective filing date is August 18, 2003.

not disabled and denied his claims for benefits. (Tr. 14-23). Plaintiff requested review of the ALJ's decision by the Appeals Council, and offered a psychological report as additional evidence. (Tr. 171-179). The Appeals Council denied plaintiff's request, even after considering the additional evidence. (Tr. 3-6).

While his request for review was pending before the Appeals Council, plaintiff filed a second claim for Supplemental Security Income. Plaintiff again alleged disability since March 1, 2002. A second ALJ[2] found that plaintiff was disabled, with an onset date of June 3, 2005. That ALJ declined to reopen this case, finding that there was no new or material evidence which warranted such action.

Because this case was not reopened and the Appeals Council denied plaintiff's request for review, the ALJ's determination denying plaintiff benefits stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. **Evidence Before the ALJ**

At the hearing, plaintiff testified that he was 42 years old and had completed his GED. (Tr. 186). Plaintiff also testified that he had obtained an automotive degree or certificate from community college. (Tr. 187). At the time of the hearing, he lived in a house with his mother and was unmarried. (Tr. 186).

---

[2]Because this subsequent filing was a separate claim, the ALJ who determined that claim was not the same as the ALJ who denied plaintiff's claims in this action. When the term "ALJ" is used in this order, it refers to the ALJ who decided this present case unless otherwise noted.

Plaintiff initially reported his height to be 5'11'' and his weight at 250 pounds. (Tr. 104).

From 1986 until 1988, plaintiff worked as an automotive repairman for Valvoline. (Tr. 93). In 1988 he began working in a warehouse for a food distribution company. (Tr. 93). According to plaintiff's testimony, this work involved lifting and carrying objects while loading trucks. (Tr. 187). Plaintiff worked at the warehouse until February of 1993. (Tr. 93). Plaintiff did not report any further work until August 1997, when he began working as a baker for Haas Bakery. (Tr. 93). He continued this work until December 2000. (Tr. 93). Plaintiff reported that he next worked in August 2001, again as a general laborer at a warehouse. (Tr. 93). Upon leaving that job, plaintiff worked again as a baker, until April 2002. (Tr. 93).

Plaintiff testified that he had not worked since April 2002 because of his medical complications resulting from his Hepatitis C diagnosis. (Tr. 186). At the hearing, plaintiff stated that his medical problems included bad knees, dizziness, and pain on his right side. (Tr. 188). Plaintiff sustained broken ribs when he fell down stairs during a period of dizziness. (Tr. 188). Plaintiff also testified that he was suffering from depression and anxiety problems. (Tr. 188). He had not yet seen a psychiatrist or psychologist, but was planning to see one.[3] (Tr. 189).

---

[3]Indeed, the new evidence presented by plaintiff to the appeals council for review is his later psychological evaluation finding that plaintiff suffers from major depression. (Tr. 174).

Plaintiff was not taking any medication at the time of the hearing. (Tr. 190).

Plaintiff testified that his pain and dizziness intensifies when he bends, walks up stairs, or is exposed to sunlight. (Tr. 86). He testified that he could stand for about fifteen minutes, and had no problems sitting. (Tr. 190-191). He felt that he could walk about two blocks, although doing so hurts his knees. (Tr. 191). He has no difficulty driving and will occasionally go out to eat and watch movies with his girlfriend. (Tr. 191). Plaintiff is able to do laundry and dishes, and is capable of running basic errands such as going to the bank, post office, or gas station. (Tr. 88, 90). He does his own grocery shopping and is able to carry small bags of groceries. (Tr. 88-90).

Plaintiff testified that a typical day consists of waking up around 8:00 in the morning to take his dogs outside and feed his cats. (Tr. 192). Plaintiff then watches television, reads the paper, and talks with his girlfriend until around noon. (Tr. 192-193). After lunch, plaintiff will take a nap until about 3:00 or 4:00 in the afternoon. (Tr. 89). In the evenings, plaintiff will eat supper and watch more television before taking his medications and heading to bed. (Tr. 89). Plaintiff explained that the medicine made him "very lethargic", requiring him to spend most of his days resting in bed, but not sleeping. (Tr. 89). Plaintiff enjoyed visiting family members, playing video games with his nephews, and playing ping pong. (Tr. 194). However, he testified that he had not played ping pong for two or three years. (Tr.

194).  He attempts lawn and garden work, but it causes him shortness of breath.  (Tr. 194-195).

Plaintiff testified that his day also involves reading the newspaper for jobs that he might be qualified for.  (Tr. 192-193). When asked if he had applied for any jobs, plaintiff replied that he had recently applied to an auto repair shop for a job delivering parts. (Tr. 193).  Plaintiff felt he was qualified because he was able to drive without any problems.  (Tr. 193).  Plaintiff stated that he was interviewed for the position, but did not receive the job.  (Tr. 193).  However, plaintiff claims he is "aware that . . . there is a job out there that . . . might be for [him], that [he] could do."  (Tr. 195).

### III. **Medical Records**

On March 15, 2002, plaintiff visited the South County Health Center complaining of chest pains, coughing, and vomiting.  (Tr. 155).  Plaintiff also had pain on his right side.  (Tr. 155). Plaintiff was diagnosed with Hepatitis C.[4]  (Tr. 164).  However, no liver biopsy was done at that time.[5]  (Tr. 153).  Plaintiff's doctors at the South County Health Center were Melissa Murray, M.D., and Aaron Bjorn, M.D.  (Tr. 86).  Plaintiff's doctors advised

---

[4]Hepatitis is the inflammation of the liver caused by the hepatitis virus.  Hepatitis C is the principal form of transfusion-induced hepatitis.  PDR Medical Dictionary 809-810 (2d. ed. 2000).

[5]A liver biopsy is not necessary for diagnosis of hepatitis, but is helpful in grading the severity of the disease.  See WebMD, http://www.webmd.com/content/article/6/1680_51408.htm (Jan. 4, 2007).

him that treatment would not be effective until he had been alcohol- and drug-free for at least six months. (Tr. 153). Plaintiff reported that he drank around six cans of beer each day and that he engaged in occasional drug use. (Tr. 156).

Plaintiff returned for a follow up visit on April 15, 2002. (Tr. 155). He had no complaints at that time, other than some discomfort on his right side. (Tr. 155). According to the treatment notes, plaintiff reported that he was still occasionally drinking alcohol. (Tr. 155). Plaintiff was referred to the Berland Diagnostic Imaging Center in Creve Coeur, Missouri. (Tr. 154, 170). On April 24, 2002, the Center performed a liver ultrasound on plaintiff, the results of which showed an enlarged liver consistent with plaintiff's history of hepatitis C. (Tr. 170).

On May 1, 2002, plaintiff returned to the South County Health Center for an additional follow up visit. (Tr. 154). Plaintiff again had no complaints. (Tr. 154). He indicated that he desired to have a liver biopsy, but admitted that he was still drinking six cans of beer every two days. (Tr. 154). Plaintiff's doctor did not believe that plaintiff needed a liver biopsy at that time. (Tr. 153). Plaintiff was instructed to stop drinking alcohol. (Tr. 153). On June 14, 2002, plaintiff telephoned the Health Center and reported that he had not consumed any alcohol for approximately one month. (Tr. 153).

Plaintiff returned to the Health Center in April 2003 to discuss possible treatment options. (Tr. 152). A liver biopsy was

scheduled to help diagnose and treat plaintiff's hepatitis C. (Tr. 136). Medical staff instructed plaintiff that he needed to improve his nutrition. (Tr. 151). Plaintiff weighed approximately 281 pounds, which was thirty or forty pounds more than he had weighed the previous year (Tr. 151). Plaintiff reported that he ate ice cream bars and other sweets while consuming no fruits or vegetables. (Tr. 151). Plaintiff also indicated that he had performed small workouts every other day. (Tr. 151).

A liver biopsy was performed on May 1, 2003, by G. V. Naidu, M.D., at St. Anthony's Medical Center in St. Louis, Missouri. (Tr. 137). Plaintiff's condition was found to be "chronic hepatitis C, grade 3, stage 2." (Tr. 138). Plaintiff's hepatitis was a "type 2b" infection, which, according to his doctor, has a "better prognosis than hepatitis C type 1." (Tr. 141).

On May 23, 2003, plaintiff was given peg-intron[6] and Rebetol[7] to treat his hepatitis C infection. (Tr. 144). Plaintiff did not return for an appointment or contact the Health Center again until late July. (Tr. 149). On July 30, 2003, the Health Center called plaintiff to remind him of the importance of monthly checkups. (Tr. 149). Plaintiff indicated that he was feeling moody and had some flu-like symptoms. (Tr. 149). Plaintiff came to the Health

---

[6]Peg-intron refers to peginterferon, which is typically given as an injection to treat long term (chronic) hepatitis C. See WebMD, http://www.webmd.com/hw/hepatitus_c/hw144207.asp (Jan. 4, 2007).

[7]Rebetol is the brand name for the drug ribavirin. Ribavirin is typically used in combination with the drug interferon to treat hepatitis C infections. See WebMD, http://www.webmd.com/content/article/85/98551.htm (Jan. 4, 2007).

Center a day later for a checkup. (Tr. 148-149). Plaintiff had completed nine weeks of treatment, but complained that the medications were causing dizziness. (Tr. 148). He also indicated that he felt fatigued and occasionally experienced shortness of breath. (Tr. 148-149).

Plaintiff came to the Health Center for an additional follow up visit on August 27, 2003. (Tr. 147). Plaintiff had completed fourteen weeks of hepatitis treatment and indicated that he had not taken any drugs or drunk any alcohol since January 2003. (Tr. 147). Medical notes from this visit indicate that plaintiff had no major complaints at that time. (Tr. 147). However, plaintiff did indicate that he was having some difficulty sleeping and felt an increase in "moodiness". (Tr. 147). Dr. Bjorn prescribed amitriptyline[8] to help plaintiff sleep better. (Tr. 147).

Plaintiff's next follow up visit was on September 24, 2003. (Tr. 146). By this time, plaintiff had completed eighteen weeks of hepatitis C treatment. (Tr. 146). He complained of the same side effects, but continued his medication for both insomnia and hepatitis C. (Tr. 146).

Plaintiff completed his hepatitis C treatment on November 4, 2003. (Tr. 130). Plaintiff had no complaints at that time. (Tr. 130). He indicated that he needed his medicine refilled and continued taking amitriptyline for his insomnia.

---

[8]Amitriptyline is an antidepressant agent with mild tranquilizing properties. Although it is usually used as a treatment for depression, it is also used in the treatment of sleep disorders. PDR Medical Dictionary 59 (2d. ed. 2000).

Along with his hepatitis C treatment with Dr. Bjorn, plaintiff also visited the Health Center for dental work by Lien Nguyen, D.D.S. (Tr. 123-126). On May 18, 2004, plaintiff complained of a toothache and was given Motrin to reduce the pain. (Tr. 125). Plaintiff returned on July 6, 2004, with a cavity. (Tr. 123).

Plaintiff followed up with Dr. Bjorn on August 25, 2004. (Tr. 122). He again complained of insomnia. (Tr. 122). Dr. Bjorn continued to prescribe amitriptyline to help plaintiff sleep. (Tr. 122). The medical notes do not indicate that plaintiff had any other complaints at this time.

On September 14, 2004, plaintiff called a nurse at the Health Center complaining of kidney pain on his left side. (Tr. 120). He claimed that the pain began after someone stepped on his back three days earlier. (Tr. 120). He told the nurse that he was finding it difficult to walk or breathe. (Tr. 120). The nurse recommended that plaintiff go to the emergency room rather than wait for his next scheduled appointment with the Health Center. (Tr. 120). Plaintiff indicated that he would go to the emergency room unless his condition improved. (Tr. 120).

Apparently instead of going to the emergency room, plaintiff waited until September 16, 2004, to see Dr. Bjorn. (Tr. 118). Plaintiff told Dr. Bjorn that he "hurts all over." (Tr. 118). He complained of rib pain after getting kicked in the ribs. (Tr. 118). He again indicated that he had difficulty breathing and stated that he was having knee pain. (Tr. 118). Dr. Bjorn noted that plaintiff appeared anxious and believed that he was suffering

from "depressive disorder, not elsewhere classified". (Tr. 118). Dr. Bjorn referred plaintiff to social services for counseling for depression. (Tr. 118).

Soon thereafter, plaintiff had an x-ray examination of his ribs. (Tr. 116). The x-ray showed that plaintiff probably had a "minimally displaced fracture of the anterior aspect of the left sixth and seventh ribs." (Tr. 116). On September 23, 2004, plaintiff returned to the Health Center to discuss the x-ray results with Dr. Bjorn. (Tr. 114). Plaintiff claimed that his previous pain medication was not working and requested a new prescription. (Tr. 114). Plaintiff indicated that he was still having pain in his ribs, along with joint pain and stiffness. (Tr. 114).

Plaintiff next visited Dr. Bjorn for a follow up visit on February 17, 2005. (Tr. 112). He stated he was having knee, wrist, and ankle pain. (Tr. 112). He had fallen down some stairs, twisting his ankle and landing on his left knee and wrist. (Tr. 112). Plaintiff described his knee pain as "mild," and stated that his ankle pain was "getting better". (Tr. 112). Dr. Bjorn described these injuries as "minor", and indicated that they were "resolving". (Tr. 113). Plaintiff was still having sleep problems, but did not want any more amitriptyline. (Tr. 113).

At the request of plaintiff's attorney, plaintiff underwent a psychological evaluation by F. Timothy Leonberger, Ph.D., on June 6, 2005. (Tr. 174). Plaintiff discussed his medical history with Dr. Leonberger. (Tr. 175). Specifically, plaintiff stated that he

had dislocated his shoulder when he was 23 years old, and reported that his shoulder occasionally still popped out of place. (Tr. 175). He also reported that at that same age he was stabbed in the back and suffered a collapsed lung. (Tr. 175). Plaintiff stated that when he was 38 years old, he severely twisted his knee. (Tr. 175). He reported that his knee still occasionally swells up and causes plaintiff pain. (Tr. 175).

Plaintiff also discussed his hepatitis C history with Dr. Leonberger. (Tr. 175). He told Dr. Leonberger that it was during his treatment for hepatitis C when he first became angry and depressed. (Tr. 175). Plaintiff also described an altercation he had with police officers in 2003. (Tr. 175). He claimed that this altercation resulted in a fractured fibula, bruised kidney, dislocated shoulder, injured knee, and concussion. (Tr. 175). Plaintiff stated that he was treated for these injuries at Alexian Brothers Hospital. He also told Dr. Leonberger that he had fractured three ribs in August of 2004, when he fell down a flight of stairs. (Tr. 175). Plaintiff was not taking any medication at the time of his psychological evaluation. (Tr. 175-176).

Plaintiff told Dr. Leonberger that he had been treated by Dr. Bjorn for depression from April 2004 through December 2004. (Tr. 176). According to plaintiff, Dr. Bjorn was critical of plaintiff's decision to seek disability benefits. (Tr. 176). Plaintiff claimed that he was still suffering from psychological problems, and frequently suffered anxiety as a result of his previous altercation with the police. (Tr. 176). Dr. Leonberger

noted that plaintiff was visibly upset and close to tears when describing these feelings. (Tr. 176).

Dr. Leonberger found that plaintiff suffered from major depression[9]. (Tr. 177). He also noted that plaintiff had symptoms consistent with post-traumatic stress disorder, stemming from his encounter with the police in 2003. (Tr. 177). Dr. Leonberger found mild to moderate impairment in plaintiff's ability to perform the activities of daily living. (Tr. 178). Plaintiff's social functioning skills showed moderate to marked impairment. (Tr. 178). Marked impairment was found in the areas of "concentration, persistence, and pace", and "deterioration or decompensation in work". (Tr. 178).

## IV. **The ALJ's Decision**

The ALJ made the following findings:

1.    The claimant met the disability insured status requirements of the Social Security Act on March 1, 2002.

2.    The claimant has not engaged in substantial gainful activity since at least March 1, 2002.

3.    The medical evidence establishes that the claimant has Hepatitis C, obesity and a depressive disorder-not elsewhere classified. However, he does not have an impairment or combination of impairments listed in, or medically equal to, the appropriate listings set forth in Appendix 1, Subpart P, Regulations No. 4.

4.    The allegations of symptoms, or combination of symptoms, of such severity as to preclude all types of work activity are not consistent with the evidence as a whole and are not persuasive.

---

[9]Major depression is a mental disorder characterized by sustained depression of mood, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness. PDR Medical Dictionary 478 (2d. ed. 2000).

5.   The claimant's impairments preclude frequently lifting and carrying more than ten pounds and occasionally lifting and carrying more than twenty pounds.

6.   The claimant cannot perform his past relevant work.

7.   The claimant is a younger individual with a high school education.

8.   In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material.

9.   The claimant can perform other work existing in significant numbers.  This finding is based upon Medical-Vocational Rules 202.20 through 202.22, or Table No. 2 of Appendix 2, Subpart P, Regulations No. 4.

10.  The claimant has been able to perform other work, existing in significant numbers, since March 1, 2002. The claimant has been able to perform substantial gainful activity since March 1, 2002.  The claimant was not under a disability, as defined under the Social Security Act, at any time through the date of this decision.

## V.  Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of

-13-

substantial gainful work which exists in the national economy." 42
U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner
employs a five-step evaluation process, "under which the ALJ must
make specific findings." Nimick v. Secretary of Health and Human
Serv., 887 F.2d 864 (8th Cir. 1989).  The ALJ first determines
whether the claimant is engaged in substantial gainful activity.
If the claimant is so engaged, she is not disabled.  Second, the
ALJ determines whether the claimant has a "severe impairment,"
meaning one which significantly limits her ability to do basic work
activities.  If the claimant's impairment is not severe, she is not
disabled.   Third, the ALJ determines whether the claimant's
impairment meets or is equal to one of the impairments listed in 20
C.F.R. Part 404, Subpart P, Appendix 1.   If the claimant's
impairment is, or equals, one of the listed impairments, she is
disabled under the Act.  Fourth, the ALJ determines whether the
claimant can perform her past relevant work.  If the claimant can,
she is not disabled.  Fifth, if the claimant cannot perform her
past relevant work, the ALJ determines whether she is capable of
performing any other work in the national economy.  If the claimant
is not, she is disabled.  See 20 C.F.R. §§ 404.1520, 416.920
(2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A.   Standard of Review

The Court must affirm the Commissioner's decision, "if the
decision is not based on legal error and if there is substantial
evidence in the record as a whole to support the conclusion that

the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1. the ALJ's credibility findings;

2. the plaintiff's vocational factors;

3. the medical evidence;

4. the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5. third-party corroboration of the plaintiff's impairments; and

6. when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

"In cases involving the submission of supplemental evidence subsequent to the ALJ's decision, the record includes that evidence submitted after the hearing and considered by the Appeals Council." Bergmann v. Apfel, 207 F.3d 1065, 1068 (8th Cir. 2000). In these

instances, the Court must "decide how the ALJ would have weighed the new evidence had it existed at the initial hearing." Id.

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

### B. Plaintiff's Allegations of Error

Plaintiff claims that the ALJ's finding that he was not disabled is not supported by substantial evidence. Plaintiff argues that the decision of the ALJ contains inherently contradictory conclusions regarding the severity of plaintiff's impairments. Specifically, in the "evaluation" section of the decision, the ALJ found that plaintiff's impairments were not severe impairments under step two of the sequential evaluation. But in the "findings" section of the decision, the ALJ made an express finding that plaintiff's impairments were so severe as to preclude him from performing his past relevant work. In this section, the ALJ found that plaintiff was not disabled because he could perform other work under step five of the sequential evaluation. Plaintiff asserts that this inconsistency makes it unclear as to whether his application was denied on the second or fifth step of the sequential evaluation. This is important, plaintiff states, because the burden shifts to the defendant on the

fifth step. Defendant contends that the ALJ concluded that plaintiff's impairments were not severe under step two and that any findings beyond that point were simply alternative or hypothetical findings.

Plaintiff also argues that the Appeals Council erred by not giving substantial weight to the report of Dr. Leonberger. Plaintiff notes that the second ALJ adopted portions of Dr. Leonberger's report. Defendant states that the second ALJ decision is not applicable to this case, because the 2005 SSI application is not before the Court. Defendant notes that the second ALJ found that "[t]here is no new or material evidence to warrant reopening [this] decision."

The Court will first address plaintiff's contention that the second ALJ's opinion is relevant to this matter. Even though plaintiff also alleged an onset date of March 1, 2002 in his second application, the second ALJ found only that plaintiff had been disabled since June 3, 2005. There is no inconsistency between that decision and the current one which finds that plaintiff was not disabled prior to the May 17, 2005 decision. The second ALJ's findings relate to a time period that is irrelevant to this current application.

The next issue the Court will address is the alleged inconsistency between the "evaluation" section and the "findings" section. In the "evaluation" section of his decision, the ALJ stated that "claimant has failed to establish a severe medically determinable impairment or severe combination of impairments

imposing significant limitations of function, for twelve consecutive months in duration." (Tr. 21). The ALJ concluded that "[t]he claimant is not disabled." (Tr. 21). The ALJ could have ended his analysis at this point. Instead, he continued:

> However, even if assuming arguendo that the clamant's Hepatitis C and obesity are severe impairments imposing significant limitations of function for twelve consecutive months in duration, the undersigned finds that after giving the claimant all possible but reasonable benefit of the doubt, the undersigned finds that such impairments would only preclude, at most: frequently lifting and carrying more than ten pounds; and occasionally lifting and carrying more than twenty pounds. The record does not establish the existence of any other persistent, significant, and adverse limitation of function due to any other ailment.

(Tr. 21). The ALJ proceeded to find that, even under this alternative analysis, plaintiff's claims still fail because he is capable of performing other work existing in significant numbers. (Tr. 21). A reading of the "evaluation" section gives one the impression that plaintiff's claims failed because the ALJ found that plaintiff did not suffer from a severe impairment.

However, plaintiff argues that the "findings" section of the ALJ's decision gives the opposite impression. In this section, the ALJ found that "[t]he claimant cannot perform his past relevant work." (Tr. 22). The ALJ also found that "[t]he claimant's impairments preclude frequently lifting and carrying more than ten pounds and occasionally lifting and carrying more than twenty pounds." (Tr. 22). Plaintiff insists that these findings are inherently inconsistent with the conclusions made by the ALJ in the

-18-

"evaluation" section. Defendant contends that these findings are merely alternative findings, as discussed in the "evaluation" section.

The Court finds that the combination of the "evaluation" section and the "findings" section creates unnecessary confusion as to the severity of plaintiff's impairments. While the former indicates that plaintiff's claims failed on step two, the latter gives the impression that plaintiff's claims fail only on step five. Defendant's argument that the two sections are consistent because the "findings" section contains only alternative findings beyond step two is unpersuasive. Nothing in the "findings" section indicates that any of the specific findings are intended to be merely alternative or hypothetical in nature. Instead, the ALJ specifically states, "The claimant cannot perform his past relevant work." (Tr. 22). It is significant that, even though all but four paragraphs of the "evaluation" section are devoted to explaining why plaintiff's impairments are not severe, there is not any finding to that effect in the "findings" section.[10] There is simply no indication in the "findings" section that plaintiff's impairments are not severe. Without such, it is even more

_____

[10]The only finding which seemingly indicates that plaintiff's impairments are not severe is finding #4, which states that "[t]he allegations of symptoms, or combination of symptoms, of such severity as to *preclude all types of work activity* are not consistent with the evidence as a whole and are not persuasive." (Tr. 22)(emphasis added). However, step two does not require that the impairment "preclude all types of work activity." It requires only that the impairment have more than a minimal effect on the claimant's ability to work. See Nguyen v. Chater, 75 F.3d 429, 431 (8th Cir. 1996).

-19-

difficult to classify the express findings that the ALJ did make as alternative or hypothetical. The only conclusion one can draw from the "findings" section is that the ALJ specifically found that plaintiff could not perform his past relevant work.

Such a finding seems to contradict the ALJ's conclusion in the "evaluation" section that plaintiff's impairments are not severe. A finding that impairments are not severe at step two is appropriate "only in cases where there is no more than a minimal effect on the claimant's ability to work." Hudson v. Bowen, 870 F.2d 1392, 1396 (8th Cir. 1989). Thus, while the "evaluation" section indicates that plaintiff's impairments have no more than a minimal effect on his ability to work, the "findings" section concludes that those same impairments preclude him from performing his past relevant work or from frequently lifting over ten pounds. It is unclear how an impairment which totally precludes relevant work can also be said to have only a minimal effect on the ability to work, and the ALJ does not offer any explanation as to how these two seemingly inconsistent conclusions can be reconciled.[11] This contradiction casts doubt on the ALJ's actual conclusions regarding the severity of plaintiff's impairments, and whether those conclusions were based on the proper standard.

---

[11]It may be possible that a claimant's past work is so demanding that a minor impairment may still preclude it without having more than a minimal effect on the basic ability to work. However, the ALJ does not discuss the requirements of plaintiff's past relevant work as a baker and warehouse worker, which leads the Court to believe that the ALJ did not base his conclusions on this rationale.

The Court recognizes that any "deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case." Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999). However, "inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand." Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir. 2005)(finding that remand was appropriate when ALJ's decision had internally inconsistent findings). Further, in order for the Court to engage in a meaningful review of the ALJ's decision, it must first be able to clearly determine what exact findings were made by the ALJ. See Herbert v. Barnhart, 2002 WL 31180762 at *10 (D. Kan. 2002)(remand is appropriate to resolve the inconsistency where the "evaluation" section of the ALJ's decision stated that testimony was "not credible" but the "findings" section stated that the same testimony was "not entirely credible"); Fleetwood v. Barnhart, 2007 WL 18922 at *2 (10th Cir., Jan. 4, 2007)(finding that remand is appropriate action to clarify ALJ's inconsistent severity findings).

The Court finds that remand is necessary to clarify the confusion created by the apparent inconsistencies contained within the "evaluation" and the "findings" sections. The Court cannot adequately review the ALJ's decisions until it has a firm grasp of what they are. Although remand is appropriate, the circumstances which give rise to sentence six remands are not present. See Buckner v. Apfel, 213 F.3d 1006 (8th Cir. 2000). Therefore, the remand is in accordance with sentence four of 42 U.S.C. § 405(g).

Sentence four remands cannot exist without affirming, modifying, or reversing the decision of the Commissioner.  <u>See</u> <u>Brown v. Barnhart</u>, 282 F.3d 580, 581 (8th Cir. 2002).  Thus, the Court must also reverse the Commissioner's decision.  However, in doing so, the Court does not find that plaintiff is disabled, nor does it assume that the Commissioner will find plaintiff disabled on remand.

Because this matter is being remanded for further proceedings, it is not necessary to address plaintiff's remaining claims.

## VI. <u>Conclusion</u>

For the reasons discussed above, this matter is reversed and remanded in accordance with sentence four of 42 U.S.C. § 405(g). On remand, the ALJ should re-evaluate and make an express finding regarding the severity of plaintiff's impairments.  Additionally, the ALJ should clearly state which step, if any, of the sequential process defeats plaintiff's claims.  Doing so should resolve any apparent inconsistency between the "evaluation" section and the "findings" section of the ALJ's decision.

Accordingly,

**IT IS HEREBY ORDERED AND ADJUDGED** that the decision of the Commissioner is **reversed** and this case is **remanded** for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).

_____
CAROL E. JACKSON
UNITED STATES DISTRICT COURT

Dated this 20th day of February, 2007.